# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Daryll Christopher Dykes and
Sharon Luster Dykes,

        Debtors.

                                         Chapter 7
                                         BKY 16-42199-KHS
_____

James L. Snyder, United States Trustee,

        Plaintiff,

v.                                             ADV 17-4022-KHS

Daryll Christopher Dykes and
Sharon Luster Dykes,

        Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

    At Minneapolis, Minnesota, February 26, 2018.

    This adversary proceeding came on for a one day trial commencing on October 13, 2017, to determine whether the Court should deny the defendants' discharge. For the reasons stated below, the Court finds in favor of the plaintiff and the defendants' discharge is denied.

### TRIAL BACKGROUND

    At trial, Michael R. Fadlovich appeared on behalf of the plaintiff; and Thomas H. Olive appeared on behalf of the defendants. After trial, and pursuant to this Court's Amended Order entered on October 20, 2017, the plaintiffs' post-trial briefing was due November 20, 2017, and the defendants' post-trial briefing was due on December 20, 2017. Any responses to post-trial

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *02/26/2018*
Lori Vosejpka, Clerk, by LH

briefs were due on January 4, 2018.  All post-trial briefing has been concluded and the Court

took the matter under advisement.  In this adversary proceeding, the United States Trustee seeks

an order denying the defendants' discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(2)(B),

(a)(3), (a)(4)(A) and (a)(5).[1]

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157(b)(1) & 1334, FED. R. BANKR. P. 7001, and Local Rule 1070-1.  This is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2)(J).

### THE PARTIES

Plaintiff James L. Snyder[2] is the United States Trustee for Region 12, which includes

Minnesota.   The U.S. Trustee has standing to commence this adversary proceeding pursuant to

28 U.S.C. § 586(a) and 11 U.S.C. § 727(c)(1).

Defendant Daryll Christopher Dykes is a resident of the State of Minnesota and a debtor

in the bankruptcy case ("Mr. Dykes").

Defendant Sharon Luster Dykes is a resident of the State of Minnesota and a debtor in the

bankruptcy case ("Ms. Dykes").[3]

### WITNESSES

1.      The following witnesses provided testimony at the trial:

- Daryll Dykes – Mr. Dykes is a defendant and was not a credible witness. He
  was evasive and hesitant when testifying and claimed not to know facts that
  would be expected of a man with his education, background and watch
  collection experience. This will be more fully discussed below.

---

[1] The plaintiff's original Complaint included objections to discharge under § 727(a)(2)(A), (a)(3) and (a)(5), but his post-trial brief added objections to discharge under § 727(a)(2)(B) and (a)(4)(A).
[2] This adversary proceeding was originally filed by Daniel M. McDermott as the U.S. Trustee for Region 12.  James L. Snyder succeeded Mr. McDermott as the U.S. Trustee for Region 12 effective January 7, 2018.
[3] Because both Mr. and Ms. Dykes are physicians, the Court will not use the honorific "Dr." when referring to them, but will instead refer to them as "Mr." and "Ms." in order to avoid confusion and distinguish between them.

- Sharon Dykes – Ms. Dykes is a defendant and was a credible witness. She answered questions fully and without hesitation, and knew expected facts.

## PROCEDURAL HISTORY

2.      On July 26, 2016, the defendants filed a petition for relief under chapter 7 of the Bankruptcy Code.  The case is currently pending before this Court and it remains open.

3.      On October 28, 2016, this Court entered its Order extending the deadline by which the plaintiff must file an objection to the debtors' discharge to December 31, 2016.

4.      On December 15, 2016, this Court entered its second Order extending the deadline by which the plaintiff must file an objection to the debtors' discharge to February 15, 2017.

5.      On February 15, 2017, the plaintiff timely filed his complaint objecting to discharge against the defendants.

## FACTS

The following facts were either stipulated to by the parties or found by the Court after trial:

6.       This is the defendants' only bankruptcy case.

7.      The defendants are both trained as physicians and surgeons.  Mr. Dykes also has a law degree.  At the time that their bankruptcy case was commenced, or shortly prior to the commencement of the case, the defendants were practicing medicine, either independently or through professional corporations and Mr. Dykes was serving as a Robert Wood Johnson Foundation Health Policy Fellow in Washington, DC.

8.      The defendants' bankruptcy schedules in their case show that the defendants owe governmental (taxing) entities, $184,008.00, student loan lenders $137,262.80 and general unsecured creditors $4,963,862.02.

3

9.      The defendants filed their bankruptcy case due to debts and judgments owed to various creditors, including a judgment against the defendants in excess of $2,400,000.00 in favor of Alliance Bank and a judgment against the defendants in excess of $1,746,000.00 in favor of Lecy Construction. Both of those judgments arose from the construction of a home that the defendants had built for themselves on Ingerson Road in Arden Hills, Minnesota.

10.     The chapter 7 trustee, Nauni Jo Manty, conducted the § 341(a) meeting of creditors on September 30, 2016.

11.     On December 29, 2016, the chapter 7 trustee commenced a motion for turnover against the defendants, seeking the turnover of a Bergamo Orbita Watch Winder, an iWatch, a Fitbit and certain scheduled electronics. On January 18, 2017, the motion was granted by default. The defendants entered into an agreement with the chapter 7 trustee with regard to the bulk of the items that were the subject of the turnover motion and that settlement was approved by the Court on August 4, 2017.

12.     On their original Statement of Financial Affairs ("SOFA") filed under oath in their bankruptcy case (Docket #10), the defendants disclosed that in the 90 days prior to the commencement of the case, they paid the IRS $18,529.10, the Minn. Department of Revenue $5,287.20, North Dakota State University $4,000.00, and Lux Communities $3,020.00. The payments to the taxing authorities were for quarterly tax deposits. The payments to North Dakota State University and Lux Communities were for the college tuition and living expenses for the defendants' son.

13.     On their original SOFA #7, the defendants stated that they made no payments to an insider on a preexisting debt in the one year before the filing of the case.

14.     On their original SOFA #13, the defendants stated that they made no gifts to any one person in excess of $600.00 per person.

15.     On October 19, 2016, the defendants filed amended schedules (Docket #16). These amendments did not amend their SOFA.

16.     On February 1, 2017, the defendants amended their SOFA #18 (Docket #33) to reflect the following transfers to or for the benefit of their adult children:

- North Dakota State University, for their son's tuition:  $25,804.01

- University of California, Riverside for their daughter's tuition:  $68,210.16

- Lux Communities for their son's housing:  $9,060.00

- Travelocity, travel expenses for their daughter:  $1,885.60

- Payments to their daughter, Sydni Dykes, for miscellaneous personal expenses:  $3,384.00

- Payments to their son, Daron Dykes, for miscellaneous personal expenses: $130.00

Total:  $108,473.77

17.     The defendants have five children and they both testified that they had paid for college tuition and living expenses for each of their older children and that they considered the $108,473.00 disclosed in the amended SOFA to be "in the ordinary course."

<u>Watches and Jewelry</u>

18.     Mr. Dykes was an avid watch collector and routinely purchased watches valued in the tens of thousands of dollars.  Between November 2008 and March 2012, Mr. Dykes purchased dozens of watches from Bellusso Jewelers in Las Vegas, Nevada.  As a result of such purchases, the defendant owed an account payable to Bellusso Jewelers of $390,700.00.

19.     Mr. Dykes testified that he and Bellusso Jewelers, through its salesman, Ezra

Bekhor, initially had a formal process for purchasing watches, which included paperwork for

each sale, but that over time, the process became very informal.  Mr. Dykes testified that

Bellusso Jewelers shipped multiple watches worth tens or hundreds of thousands of dollars by

Federal Express with no paperwork.  Mr. Dykes stated that he would keep what he wanted and

return the remainder, also by Federal Express and without paperwork.  Mr. Dykes testified that at

one point he received an Urwerk timepiece worth $107,000.00 with absolutely no paperwork,

payment or signature and that he returned the Urwerk timepiece with similar informality and did

not receive any paperwork evidencing the return.  Mr. Dykes testified that he had little or no

paperwork for many of the watches that remained in his possession at the end of the relationship.

20.     Mr. Dykes also testified that the collectible watches were not as valuable if the

owner did not keep the papers and original boxes in which the watches were delivered.  Mr.

Dykes testified that he did not keep the papers or boxes for the watches he purchased.  The Court

did not find this testimony to be credible as documents showed that the papers and boxes for the

watches were contained in large portable storage containers used by the defendants.  As will be

discussed below, the defendants failed to make monthly rental payments for the storage

containers and its contents were sold.

21.     On April 30, 2011, Mr. Dykes purchased a Kwiat platinum bridal collection ring

with a 3.15 carat diamond and two side stones.  Mr. Dykes had possession of that ring for

approximately 22 months but Ms. Dykes testified that she never saw the ring.  Ms. Dykes

testified that she had a ¾ carat diamond engagement ring, which she received in 1992. At some

point in 2006 or 2007, the stone fell out of the ring. Approximately 5 days later she found it at

the hospital where she worked but she has never had the ring fixed.

22.    The documentary evidence admitted at trial shows that the defendants took possession of at least 22 watches ranging in cost from $4,350.00 to $107,950.00, several pairs of diamond earrings and the Kwait platinum bridal collection ring.

23.    The testimony presented in the case indicates that on October 27, 2011, Mr. Dykes executed a confession of judgment in the amount of $390,700 in favor of Ezra Bekhor who worked with Bellusso Jewelers and sold the watches and jewelry to Mr. Dykes.[4]

24.    On February 26, 2013, in order to partially satisfy the confession of judgment, defendant Daryll Dykes returned: (i) 27 watches of unknown value; and (ii) the Kwiat platinum diamond ring with a 3.15 carat stone valued at $68,000 to Ezra Bekhor by turning them over to Bekhor's attorney in Minneapolis, Joann Schulkers. Defendants provided no evidence of the value attributed to the returned items or the balance due after the return.

25.    The Court does not find the testimony regarding the purchase of the watches without paperwork or receipts to be credible—if only for insurance purposes, a jeweler would want to make sure that a valuable item was received by a customer and would issue a receipt. Similarly, a sophisticated collector and customer would want documentation regarding a return. Further, Mr. Dykes testified that paperwork and boxes had been in the Dykes' storage containers.

26.    The evidence also shows that the list of the 27 watches and the bridal set returned to Bellusso/Bekhor does not match the watches included in the invoices submitted at trial. The defendants did not provide credible testimony as to the whereabouts of the other watches. The only jewelry listed in the defendants' schedules are a wedding ring valued at $35.00; a wedding band and anniversary ring valued at $700; and the two sets of cufflinks valued at $1,250. The

---

[4] The Court notes that the proof of claim filed by Ezra Bekhor, was originally filed in the amount of, $413,788.14, which included the amount of the judgment and accrued interest and expenses. On April 6, 2017, Mr. Bekhor filed an amended proof of claim in the amount of $300,669.84. The amended proof of claim attaches a copy of a Writ of Execution on the confession of judgment in the amount of $413,788.14, but it does not indicate why the claim was being amended to a lower amount.

7

defendants did not list any loose stones or diamonds on their schedules.  The Court finds that the

defendants did not accurately schedule their jewelry.

<u>Events Leading to Bankruptcy</u>

27.    The defendants lost their home on Ingerson Road in Arden Hills to a foreclosure

in 2011. Mr. Dykes testified that the foreclosure was a result of the arrest and conviction of his

personal banker for multiple counts of mortgage fraud. The fraud included the mortgage loan

related to defendants' Arden Hills house. After the defendants' personal banker was convicted,

the bank refused to restructure defendants' loan and a balloon payment became due. The

defendants were unable to pay off the balloon payment or obtain alternate financing and

therefore lost the home in foreclosure.

28.    Mr. Dykes testified that the loan for the Ingerson Road home ultimately led to the

bankruptcy filing.  After years of litigation with the bank over the loan, the bank obtained a

judgment against the defendants and levied Mr. Dyke's interest in his medical practice. His

income dropped from well over a million dollars per year to virtually nothing. This occurred in

2012.  Mr. Dykes testified that he began to rebuild his practice but the passage of the Affordable

Care Act in 2014 substantially changed their practice. He also learned in 2016 that his practice

group would lose their provider designation with both Blue Cross Blue Shield and Medica.

Those two events caused the practice to struggle and ultimately it was unable to pay its bills.[5]

29.    As a result of the foreclosure on the Ingerson Road home, Ms. Dykes rented a

home at 1335 Willow Circle in Rosemount, MN, and Mr. Dykes relocated to an apartment in

Minneapolis.  Later they both moved to 4840 Park Ave. S., Minneapolis, MN. Ms. Dykes

---

[5] Defendants' counsel argues in his post-trial briefing that business records show that the practice learned that the
contracts would not be renewed a few weeks before the bankruptcy filing.  Those business records were not
admitted into evidence and would contradict the testimony provided in Court so they will not be considered.

currently resides at the Park Avenue house while Mr. Dykes is spending most of his time in

Washington D.C. where his current employment is located.

30.      When moving out of the Ingerson Road house in March, 2012, the defendants

moved most of their personal property into three large 30-foot steel storage containers that they

rented from Dart Storage for approximately $1,000 - $1,111 per month.  The defendants stopped

paying rent on the storage containers and the personal property in those containers was sold after

the property was forfeited. Mr. Dykes testified that the rent owed on the storage containers was

approximately $10,000.00 and the property contained within them was worth hundreds of

thousands of dollars at the time of the forfeiture, which occurred prepetition.  There was no

explanation as to why they did not make the payments considering the fact that their income was

more than sufficient to cover the cost and the value of the stored property. Further, there has not

been an accounting of the property in those storage containers.

31.      Schedule I filed in the bankruptcy case lists Mr. Dykes' income as $9,729.01 and

Ms. Dyke's income as $6,961.83.

32.      At the time that these cases were commenced, Mr. Dykes had an ownership

interest in Medical and Surgical Spine Consultants of MN PLLC ("Spine Consultants").  As

such, he had control over the assets and checking account for that business.

33.      On July 15, 2016, nine days before the filing of the bankruptcy petition, Mr.

Dykes wrote a check payable to himself on the U.S. Bank checking account of Spine Consultants

for $30,836.30.  The memo line on the check described it as a distribution for July 2016.  The

check was endorsed by Daryll Dykes and either cashed or deposited into another account owned

by him on July 18, 2016.

34.      Mr. Dykes testified that these funds were used to pay the following:

- Internal Revenue Service          $18,529.10

- MN Dept. of Revenue               $5,287.20

- North Dakota State University     $4,000.00

- Lux Communities                   <u>$3,020.00</u>

    Total:                          $30,836.30

35.      The debtors have five children, all of whom are adults.  At the time of the commencement of their bankruptcy case, the defendants had a daughter (age 19) who was a student at the University of California – Riverside and a son (age 21) who was a student at North Dakota State University.

36.      Prior to Mr. Dykes' practice closing, defendants had consistently paid their children's college tuition and living expenses.  The payments reflected above to North Dakota State University and Lux Communities were for their children's tuition and living expenses.

## DISCUSSION

In this case, the plaintiff alleges that the defendants should be denied a discharge pursuant to various subsections of 11 U.S.C. § 727.

## I.  Burden of Proof

Under § 727(a) the court shall grant the debtor a discharge, unless:

- The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition.  11 U.S.C. § 727(a)(2)(A);

- The debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the estate, after the date of the filing of the petition.  11 U.S.C. § 727(a)(2)(B);

- The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.  11 U.S.C. § 727(a)(3);

- The debtor has knowingly, fraudulently, in or in connection with the case, made a false oath or account.  11 U.S.C. § 727(a)(4)(A); and

- The debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.  11 U.S.C. § 727(a)(5).

The provisions of § 727 of the Bankruptcy Code are to be strictly and narrowly construed in favor of a debtor because the denial of a discharge is an extreme remedy.  *In re Charles*, 474 B.R. 680, 683 (B.A.P. 8th Cir. 2012) (citing *In re Korte*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)).  Section 727(a) was included in the Bankruptcy Code to prevent a debtor's abuse of the bankruptcy process.  *Id.* The party objecting to the discharge must prove each element under § 727 by a preponderance of the evidence.  *Id.* at 683–84 (citing *Allred v. Vilhauer (In re Vilhauer)*, 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)); Fed. R Bank. P. 4005.

Here, the plaintiff argues that the defendants violated § 727 by knowingly or recklessly failing to disclose assets, concealing property or transactions and failing to maintain proper records. The defendants argue that their actions were not deliberate or made with the intent to defraud. As discussed below, the court agrees with the plaintiff, in part, and finds that the defendants' discharge should be denied pursuant to § 727(a)(3), (a)(4)(A) & (a)(5).

**II.     Section 727(a)(2)(A) & (B) – Transfer of property of the debtor or the estate within one year before the petition date with the intent to hinder, delay or defraud creditors.**

Under § 727(a)(2), the party objecting to the debtors' discharge "must prove: 'that the debtor's actions took place within twelve months prior to filing; that the debtor took the actions with the intent to hinder, delay or defraud creditors; and that the actions complained of in fact

consisted of transferring or concealing property.'  Further, a presumption of fraud arises when a

debtor has transferred valuable property without payment.  'Once a gratuitous transfer is shown,

the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his

creditors.'"  *Georgen-Running v. Grimlie (In re Grimlie)*, 439 B.R. 710, 716 (B.A.P. 8th Cir.

2010); *Sullivan v. Bieniek (In re Bieniek)*, 417 B.R. 133, 137 (Bankr. D. Minn. 2009); and

*Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford)*, 394 B.R. 487, 490 (B.A.P. 8th

Cir. 2008).  Subsection (a)(2)(A) relates to a transfer of property of the debtor and subsection

(a)(2)(B) is relates to a transfer of property of the estate.

The plaintiff failed to prove by a preponderance of the evidence that the defendants took

actions that justify a denial of discharge under § 727(a)(2).  The plaintiff relies exclusively on the

defendants' payment of the college tuition and living expenses for their adult children within the

one year prior to the petition date as a basis for denial of discharge under §727 (a)(2)(A).  The

Court finds that the plaintiff has shown that there was a gratuitous transfer of their property but

the defendants proved none of those transfers were made with the intent to hinder, delay or

defraud their creditors.  Both defendants testified that they had routinely paid the college

expenses of their older children, felt it was their obligation to do so and that their children's

available financial aid was based on their parents' income.  Although the payments may not have

been prudent at a time when the defendants were struggling to pay their bills, the Court does not

find that they acted with ill intent when doing so.

The plaintiff alleges that the discharge should be denied under § 727(a)(2)(B) because the

defendants concealed watches and jewelry that belong to the estate rather than turning them over

to the Chapter 7 Trustee.  The Court finds that the plaintiff has failed to meet his burden of proof

as to this cause of action.  The only evidence that the plaintiff presented about the watches and

jewelry was in the form of receipts for jewelry purchased up to ten years prior to the petition

date. While the defendants have provided no logical or reasonable explanation as to what

happened to those assets, the plaintiff has not proven by a preponderance of the evidence that the

defendants actually had that property in their possession on the petition date.[6]

### III.    Section 727(a)(3) – Concealment, destruction, mutilation, falsification or failure to keep records.

It is under §727(a)(3) that the Court finds that the discharge should be denied. That

subsection states that the court shall deny a debtor a discharge if the debtor has "concealed,

destroyed, mutilated, falsified, or failed to keep or preserve any recorded information … unless

such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C.

§ 727(a)(3). There are two elements that the plaintiff must show to prevail on this cause of

action. First, there must be a failure to maintain and preserve adequate records. Second, the

failure makes it impossible to ascertain the defendants' financial condition and material

transactions. See *Meridian Bank v. Alten*, 958 F.2d 1226 (3rd Cir. 1992); *In re Brown*, 108 F.3d

1290 (10th Cir. 1997).

The plaintiff bears the burden of proving that there is an inadequacy of records. *Floret,*

*LLC v. Sendecky (In re Sendecky)*, 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002). If the plaintiff

makes a *prima facie* showing that the defendants' records are inadequate, then the burden of

production shifts to the defendants to offer a justification for their recordkeeping (or lack

thereof). *McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012).

The Court must determine "what records someone in like circumstances" would keep. *Sendecky*,

283 B.R. at 764. Typical factors to be considered include the defendants' educational level,

---

[6] As noted above, this cause of action was not included in the original complaint and the plaintiff argues that FED. R. BANKR. P. 7015 applies and that the Court should allow an amendment or supplement of the pleadings to conform the pleadings to the evidence presented at trial. Because the Court finds that the plaintiff has failed to meet his burden of proof under this section, that issue is moot.

sophistication, and level of business experience. *Id.* The more complex the defendants'

financial affairs, the more records must be kept. See e.g., *In re Martin*, 124 B.R. 542, 543

(Bankr. N.D. Ind. 1991). Unlike some of the other § 727 objections to discharge, intent is not an

element to be proven under a § 727(a)(3) claim. *Sendecky*, 283 B.R. at 764; see also *Miller v.*

*Pulos (In re Pulos)*, 168 B.R. 682, 690 (Bankr. D. Minn. 1994). Rather, the standard is one of

"reasonableness" instead. *Davis v. Wolfe (In re Wolfe)*, 232 B.R. 741, 745 (B.A.P. 8th Cir.

1999). The defendants are "required to take such steps as ordinary fair dealing and common

caution dictate to enable the creditors to learn what [they] did with [their] estate." *Id.*

Here the plaintiff met his burden of proof by establishing the lack of documentation

regarding the purchase, sale and return of hundreds of thousands of dollars in jewelry. The

defendants, therefore, have the burden of proof to justify the lack of records. Here, the

defendants failed to provide justification for the lack of records covering the watches and jewelry

for which they had been invoiced, purchased, sold or returned. Mr. Dykes bought, sold and

traded hundreds of thousands of dollars in watches or timepieces but kept almost no records as to

what he had in his possession or the transfer or sale of those items. The invoices admitted into

evidence do not match the list of watches returned to Bellusso/Bekhar. In addition, there were

virtually no documents admitted into evidence to show the value of the watches returned to

Bellusso/Bekhar. The Court agrees with the plaintiff that the one page receipt for the return of

the watches and jewelry is wholly inadequate because it fails to list the values of the watches and

jewelry returned, and fails to provide an accounting of the credit received and the amount of any

remaining debt. Given the sloppy and "informal" business dealings between the defendants and

Bellusso/Bekhar regarding the buying, selling and trading of jewelry, there is no way for the

Court to determine what was purchased, returned or sold. The invoices admitted into evidence

14

do not match and there has been no explanation as to what happened to the watches the plaintiff

describes as "paid for" watches.  The defendants are very well educated, sophisticated

individuals and it simply defies logic that they would not have or keep records to evidence the

expensive jewelry in their possession and what was returned, if nothing else but for insurance

purposes. It also defies logic that they did not receive or keep documents indicating the value of

the returns to be deducted from the balance owing on the Confession of Judgment.  Moreover,

the defendants failed to provide any accounting of the other personal property that they had in

the storage containers that was ultimately disposed of by Dart.

The defendants' failure to maintain records of hundreds of thousands of dollars in

transactions makes it impossible to ascertain the defendant's true financial condition and material

transactions. Thus, the plaintiff has met his burden of proof and the defendants' discharge is

denied under § 727(a)(3).

## IV.    Section 727(a)(4)(A) – Knowing and fraudulent false oath or account made in connection with the case

Plaintiff also prevails on his § 727(a)(4)(A) claim. Under this provision, the plaintiff must

prove "(1) the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor

knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5)

the statement related materially to the Debtor's bankruptcy case." *Larson*, at 210-11 citing *Kaler*

*v. Charles (In re Charles)*, 474 B.R. 680, 684 (B.A.P. 8th Cir. 2012).  As this Court has

previously held, "[t]he purpose of § 727 (a)(4)(A), is to make certain that those who seek the

shelter of the Bankruptcy Code do not play fast and loose with their assets or with the reality of

their affairs." *Larson* at 210.  Moreover "'[t]he successful functioning of the bankruptcy act

hinges both upon the bankrupts veracity and his willingness to make a full disclosure.  Neither

the trustee nor the creditors should be required to engage in laborious tug-of-war to drag the

simple truth into the glare of daylight.'" *Larson* at 210 quoting *Boroff v. Tully*, 818 F.2d 106, 110 (1st Cir. 1987).

First, the Court finds that the defendants made false statements under oath regarding their assets and transfers of assets.  Because the defendants are required to sign schedules and the statement of financial affairs under the penalty of perjury, the verification of the documents has the same force and effect as an oath.  *Sullivan v. Bieniek (In re Bieniek)*, 417 B.R. 133, 138 (Bankr. D. Minn. 2009); see also *In re Charles*, 474 B.R. at 684 (finding that execution of the schedules and statement of financial affairs under penalty of perjury constitutes an "oath" for purposes of § 727(a)(4)(A)).

Second, the Court determines that the defendants made false statements with the required intent.  A statement that is made with a reckless indifference to the truth may be regarded as intentionally false and circumstantial evidence can be used to prove fraudulent intent.  *Larson* at 212 (citations omitted), see also *In re Charles*, 474 B.R. at 684.  Here, the defendants did not disclose a substantial amount of transfers for the benefit of their adult children for tuition and living expenses in their original and first amended schedules and SOFA.  They also failed to disclose the loose diamond from Ms. Dyke's engagement ring.  Although they amended the SOFA to include the additional tuition and living expenses, they did not do so until several months after they learned that the plaintiff was investigating their financial affairs and the deadline to file an objection to discharge was fast approaching. In addition, they have never amended the schedules to include the loose diamond and they have provided no explanation for this omission.  The Court finds that the defendants made these false oaths with a reckless disregard for the truth and they were, therefore, knowingly false statements.

Finally, the plaintiff has proven that the false statements are material.  A statement is material if is related to a debtor's estate, concerns the discovery of assets, or the existence and disposition of the debtor's property.  *Larson* at 212-13 citing *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992).  The value of the undisclosed asset does not determine whether there has been a materially false oath.  An omission that is directly related to the debtor's assets, makes the omission material for purposes of § 727(a)(4)(A).  *Id.* at 213.  Like in *Larson*, all of the omissions in this case relate to the defendants' assets and transfers, making them material.  In addition, the value of all of the transfers and the diamond is significant.  Thus, the plaintiff has met his burden of proof under § 727(a)(4)(A) and the burden shifts to the defendants to show that they did not act with fraudulent intent.

The defendants testified that they did not originally disclose the substantial payments for the tuition and living expenses for their children because they believed those payments were made in the "ordinary course."  They provided no evidence as to why "ordinary course" payments should be excluded from disclosure.  Further, their belief is undercut by the fact that they did not disclose the payments until they knew that they were being investigated.  They have never disclosed the diamond on their schedules.  This shows fraudulent intent.  Thus, defendants failed to prove that they did not act with fraudulent intent and te plaintiff prevails on this cause of action.

## V.    Section 727(a)(5) – Failure to explain loss of assets

The plaintiff's last cause of action is under § 727(a)(5).  This section provides that  the defendants' discharge may be denied if they have failed to satisfactorily explain any deficiency or loss of assets to meet their liabilities.  *Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 813 (Bankr. D. N.D. 2008).  Unlike other reasons for denial of a discharge, there is no intent element

17

as part of the proof under § 727(a)(5). *Id.* Whether an explanation is "satisfactory" is left to the

discretion of the court. *Id.* citing *In re Riley*, 305 B.R. at 885. The plaintiff, as the party

objecting to the discharge, has the burden of proving that a loss of assets actually occurred, but

once that burden has been met, it is incumbent on the defendants to provide a satisfactory

explanation for the loss. *Id.* Moreover, the defendants cannot simply offer a justification for

failing to satisfactorily explain the loss. *Id.* The explanation of the loss will only be satisfactory

if they convince the court that they have "not hidden or improperly shielded assets…. General

assertions that money was spent on living expenses … without documentation, are

unacceptable." *In re Huynh*, 392 B.R. at 813 *quoting Carter Engineering Co. v. Carter (In re

Carter)*, 236 B.R. 173, 180-81 (Bankr. E.D. Pa. 1999). The defendants must also offer

corroborating evidence; naked assertions alone are not sufficient. *Id.* "Unsubstantiated,

uncorroborated and undocumented testimony from the debtor is not likely sufficient." *Allred v.

Vilhauer (In re Vilhauer)*, 458 B.R. 511, 515 (B.A. P. 8th Cir. 2011).

　　　　Here, the plaintiff has shown that the defendants owned at least four watches with a retail

value of $145,650.00 that were not included in the list of watches returned to Bellusso/Bekhar.

Mr. Dykes testified that there were no watches in the storage containers when the contents were

sold at auction for nonpayment of rent but he has not provided any corroborating evidence to

support this testimony. The defendants have wholly failed to provide any documents to show

what happened to those watches or to provide an accounting of the assets in the storage

containers that were lost. Accordingly, the plaintiff has met his burden of proving the assets

existed and the plaintiffs have failed to satisfactorily explain what happened to the watches or

provide corroborating evidence. Thus, the defendants are also denied a discharge under

§727(a)(5).

As discussed above, the plaintiff asserted this cause of action, as well as the

§ 727(a)(2)(B) cause of action for the first time in his post-trial brief.  The plaintiff argues that

FED. R. BANKR. P. 7015 applies and the Court should allow an amendment or supplement of the

pleadings to conform the pleadings to the evidence presented at trial.  Because the Court finds

that the discharge should also be denied pursuant to § 727(a)(3) & (a)(4)(A), which were

included in the original complaint, the Court will not address the request to allow an amendment

or conform the pleadings to the evidence.

## CONCLUSION

Thus, the defendant's discharge is denied.

## CONCLUSIONS OF LAW

1. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J) and this

   Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) & 1334, FED. R. BANKR. P.

   7001, and Local Rule 1070-1.

2. Venue is proper before this Court under 28 U.S.C. §§ 1408 & 1409.

3. The defendants' discharge is denied.

## ORDER

IT IS ORDERED:  The defendants' discharge is denied pursuant to 11 U.S.C.

§ 727(a)(3), (a)(4)(A) & (a)(5).

LET JUDGMENT BE ENTERED ACCORDINGLY.


/e/ Kathleen H. Sanberg
_____
KATHLEEN H. SANBERG
CHIEF UNITED STATES BANKRUPTCY JUDGE